FILED
SEP 30 1999
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

ENTERED
OCT 0 1 1999

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| PERRY WOODS, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiffs | ) ) |
| v. | ) ) |
| BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA, *etc., et al,* | ) ) ) |
| Defendants | ) |

Civil Action Number

87-C-2182-S

## MEMORANDUM OPINION ON CLAIMS OF JEROME BALL

Class member Jerome Ball makes two claims in this case. First, he claims that his job is improperly classified, in violation of the Consent Decree. His second claim is that after he complained about the improper classification of his job, he was retaliated against by being suspended for five days without pay. The Court finds merit in each of these claims.

I.

Ball is formally classified as a machine operator- essentially a laborer - in the Hospital Maintenance Department of Facilities Management Division of the defendant Board of Trustees of the University of Alabama ("UAB"). He contends that he performs the work of a machine mechanic, and that he should therefore be classified as such.

Without doubt, there is considerable overlap in the two jobs.

Ball credibly testified that he performs all of the job duties listed on the machine mechanic job description; and there is no credible evidence to the contrary. For more than five months, he was assigned to the night shift and the attendant responsibility of making all of the inspections, preventive maintenance, and needed repairs on the Rapistan (i.e., a conveyor-lift system used to transport medical equipment /supplies from one area to another).

John Cook, Ball's immediate supervisor, grudgingly concedes that Ball "possibly could" perform the duties of machine mechanic. Transcript of June 9, 1995, Hearing ("TR") 83. In his observation of Ball's performance of the various duties of maintenance mechanic, he has not seen Ball perform any one of them inadequately. When faced with the direct question, "Did you [at the time of the meeting on Ball's grievance] have an opinion at that time as his supervisor as to whether he was properly classified?," Cook punted. His response was, "Well, I was not,uh, involved in the hiring of Mr. Ball. So a lot of his background before he was hired there I didn't know. I felt like he was doing his job very well." Tr. 85. Obviously, if Cook had felt that Ball were properly classified as a machine operator, rather than a machine mechanic, he could have said so. And at the time that Cook responded, Ball was actually performing the job of mechanic. Cook and his supervisor, William A. Cope, so much regarded Ball as a mechanic that on a February 6, 1995, counseling form, they themselves listed his title as "machine mechanic." Defendant's Exhibit ("DX") 12.

The Court concludes that the defendant UAB violated Section I.A., p. 3 of the

Consent Decree by failing to properly classify Ball as a machine mechanic. He is entitled to be so classified, with appropriate backpay, prejudgment interest, and other accrued benefits retroactive to March 9, 1991.

## II

Ball's second claim is that UAB suspended him for five days in retaliation for his having filed his first complaint. That claim is supplemented by a retaliation claim based on a suspension three days before Ball testified in this case.

### A.1

The UAB Tardiness Policy provides, in relevant part:

> Being tardy twice (2) in a calendar week (Sunday-Saturday) or three (3) times in four (4) consecutive weeks will be considered excessive tardiness.
>
> Reporting to work more than thirty (30) minutes late for your assigned shift without notifying your Supervisor will be considered excessive tardiness. .... Excessive tardiness will follow normal progressive disciplinary actions. (Example: verbal counseling, written warning, one (1) day suspension, etc.)

DX 6.

Ball filed his misclassification complaint on September 26, 1994. Cope responded to the complaint two days later, denying that Ball's job was improperly classified. DX 1.

On several occasions after the misclassification grievance was filed, Cope inquired of Ball whether he would dismiss or withdraw the complaint. Tr. 43. After the fourth such occasion, in November 1994, Cope required Ball to affirm in writing his decision to proceed with the grievance. Ball complied. Plaintiff's Exhibit ("PX") 6.

2.

On December 5, 1994, Ball was given a "misconduct" disciplinary warning for having parked in an unauthorized parking spot during his lunch break. DX 13.

On December 14, 1999, around (9:00 A.M, Ball told his supervisor Cook that he was sick and needed to go and see his doctor. Ball had been called into work an hour early that day. Although UAB written policies do not require a doctor's excuse in such circumstances, Cook informed Ball that he would need to bring a doctor's excuse on his return to work. Cook was not able to get an appointment with his doctor; but the nurses told him that if he came in, they would try to "fit him in" between scheduled patients. Cook told Ball that he was needed at work; and that Ball should call him around noon and let him know whether he was coming back to work.

Ball waited in vain for the rest of the day to see the doctor. While in the office, he beeped Cook, who did not answer. Ball then told Cook's secretary Linda of his whereabouts, and that Cook should call him at the doctor's office. Cook did not call.

On the next morning when Ball arrived at work, Cook asked for his doctor's excuse. Ball explained that he had been unable to see the doctor; but that if Cook had doubt, he could call the doctor's office and the staff would confirm his presence the preceding day. Instead of checking with the doctor's staff, Cook, with Cope's approval, suspended Bell for three days without pay.

3.

On March 29, 1995, Ball was suspended for five days without pay *and* placed on

probation for a 90-day period, ostensibly for "excessive tardiness." The suspension notice recites: "Mr. Ball was tardy on February 23rd, March 7th and March 17th. This is excessive tardiness as defined by the departmental policy." PX 9.

The time records reflect that Ball was <u>one minute</u> late on February 23; <u>one minute</u> late on March 7: and <u>one minute</u> late on March 17. *Id.,* p. 2.

On its face, the disciplinary action transgressed UAB's own policy.

The first of the three alleged dates of tardiness occurred, under UAB's policy, during the week of February 18 - 24. The second date occurred during the non-consecutive week of March 3-9. And the third alleged tardiness occurred during the non-consecutive week of March 17 - 23. Thus, during the relevant period, Ball was never "[t]ardy twice (2) in a calendar week (Sunday-Saturday) or three (3) times in four consecutive weeks...." DX 6. Moreover, during the relevant period, Ball never reported to work "...more than thirty (30) minutes late for [his] assigned shift...." *Id.*

Given UAB's tardiness policy, Cook's testimony that he has never suspended anyone else for being only a minute late is unremarkable. Tr. 88.

What is remarkable is that for each of the dates for which Ball was suspended, <u>his supervisor had expressly affirmed that Ball had arrived at work on time</u>, and had so indicated on the time cards! PX 9; Tr. 49, 150. Indeed, on two of the time cards (March 7 and March 17) Cook penned in the time "3: 30 [the starting time of Ball's shift]" and initialed the cards.

Cook verified that on February 23, Ball and another mechanic had arrived prior to

the commencement of their shift; but that before they could clock in, they had been intercepted by another supervisor who needed immediate assistance in restoring items which had fallen off the Rapistan. They provided the assistance, which resulted in Ball's clocking in at 3:31 and the other mechanic clocking in at 3: 32. Cook specifically told Ball that he had checked with the other supervisor before initialing their time cards. Tr. 51.

Cook also knew that although Ball had timely arrived at work on March 7, Ball had inadvertently locked his keys in his locker when he left after having worked overtime the preceding night; and Ball therefore did not have access to the time clock room when he arrived at work. Cook initialed Ball's time card only after he had checked with others to insure that Cook had in fact arrived at work by 3: 30. Tr. 49 -51.

Though there was no direct testimony on the issue, the Court infers that Cook likewise verified with Ball's co-worker that Ball had timely reported to work on March 17, but he had left his keys at home and therefore did not have immediate access to the time clock room..

UAB agrees that if Ball were not tardy on either of the three days, he should not have been placed on probation. Tr. 138.

The Court finds without hesitation that the animus which motivated UAB's five-day suspension* of Ball both frustrated the Consent Decree and violated Title VII of the

---

\*　　After this unlawful suspension, on April 18, 1995, Ball signed a UAB-prepared form entitled, "Withdrawal of Complaint," which reads: "My complaint has been satisfied at this meeting. I wish to hereby withdraw

my complaint." PX 11.

The Court finds that Ball's signature was not voluntarily given; rather it was a product of UAB's coercion and his hope that "... if [he] dropped the complaint, they – they would just leave [him] alone." Tr. 55.

Less than a month after the "withdrawal" was signed by Ball, he filed instant the retaliation grievance under the procedures set forth under the Consent Decree. Court File Document 215.

1964 Civil Rights Act.

B.

While the inappropriate 90-day probationary period was still in effect, Ball was again suspended. The Court again finds that the suspension was retaliatory.

Cook asked Ball to work two and a half hours overtime preceding the start of his 12:30 shift on the Saturday before the hearing in this case. Ball clocked in at (: 56 A.M. - four minutes before this scheduled overtime shift. But when he arrived at the worksite, the other workers had already completed the preparatory work and were waiting on the welder. Ball then proceeded and took his lunch break. Following his lunch break, he worked on another job, i.e. the compactor, until the welder arrived. He called back to the jobsite; and when the welder arrived, he went to the jobsite and worked there until he clocked out at 4:55 P.M. Tr. 57, 58.

Cook admits that if, at any time, any of Ball's co-workers had wished to contact him while he was at work that day, they could have beeped him. Tr. 104.

On the following Thursday, Cook summoned Ball to his office. He asked Ball for his keys, his pager, and his identification card ("ID"). He then told Ball to " go home, and

they would get back in touch with [Ball] on what they were going to do." Ball had not heard from UAB as of the date of the hearing.

Cook's suspension of Ball violated UAB's policies and procedures. Before an employee is suspended, he should be given an explanation of the reason. Tr. 135, 136.

It is Cook's intention to recommend that Ball be discharged. Tr. 97.

If Ball is discharged, pursuant to Cook's recommendation, it will be based on his violation of the probation imposed on him by UAB.

The Court finds and concludes that the indefinite suspension of Ball was motivated by the fact that he elected to pursue his claims in this Court.

By separate order, Ball will be granted the relief to which he is entitled.

Done this 30th day of September, 1999.

_____
United States District Judge
U.W. Clemon